**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | No. CR 11-2385-PHX-JAT-DKD-001-002 |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| 1. Stephen Kerr; | ) | |
| 2. Michael Quiel; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

        Pending before the Court are: Defendant Stephen Kerr's ("Kerr") Renewed Motion for Rule 29 Judgment of Acquittal or, in the alternative, a New Trial (Doc. 302), and Defendant Michael Quiel's ("Quiel") Motion for a Judgment of Acquittal or for a New Trial (Doc. 301).[1] The Court now rules on these Motions.

**I.    Background**

        In the Indictment (Doc. 3), Kerr was charged with Conspiracy to Defraud the United States (Count 1), Willful Subscription to False Individual Tax Returns for 2007 and 2008 (Counts 2 and 3), and Failure to File Foreign Bank and Financial Accounts (FBARs) for 2007 and 2008 (Counts 6 and 7). Count 1 charged Kerr, Quiel, and Christopher Rusch ("Rusch"), their former attorney, with conspiring to establish companies and bank accounts

---

        [1] Quiel joined in Kerr's Renewed Motion for Rule 29 Judgment of Acquittal or, in the alternative, a New Trial. (*See* Doc. 304). Therefore, the Court's conclusions regarding Kerr's Motion apply to Quiel as well.

in Switzerland to move money out of the United States and defraud the IRS. Counts 2 and 3 charged Kerr with intentionally omitting income from the foreign accounts on his 2007 and 2008 tax returns and intentionally failing to mark the box in Schedule B indicating an interest in a foreign bank account. Counts 6 and 7 charged Kerr with willfully failing to file FBARs to report his interest in the foreign accounts. On April 11, 2013, a jury acquitted Kerr of Count 1, and convicted him of Counts 2, 3, 6, and 7. Kerr now moves the Court to set aside the jury verdicts and enter judgments of acquittal, or, alternatively, grant a new trial.

Quiel was charged with Conspiracy to Defraud the United States (Count 1), Willful Subscription to False Individual Tax Returns for 2007 and 2008 (Counts 4 and 5), and Failure to File FBARs for 2007 and 2008 (Counts 8 and 9). Count 1 charged Kerr, Quiel, and Rusch with conspiring to establish companies and bank accounts in Switzerland to move money out of the United States and defraud the IRS. Counts 4 and 5 charged Quiel with intentionally omitting income from the foreign accounts on his 2007 and 2008 tax returns and intentionally failing to mark the box in Schedule B indicating an interest in a foreign bank account. Counts 8 and 9 charged Quiel with willfully failing to file FBARs to report his interest in the foreign accounts. On April 11, 2013, a jury acquitted Quiel of Count 1, and convicted him of Counts 4 and 5. The jury was unable to reach a verdict on Counts 8 and 9, which the Government later dismissed. Quiel and Kerr now moves the Court to set aside the jury verdicts and enter judgments of acquittal, or, alternatively, grant a new trial.

## II.   Legal Standards

### A.   Judgment of Acquittal

"A defendant may move for a judgment of acquittal . . . within 14 days after a guilty verdict or after the court discharges the jury." Fed. R. Crim. P. 29(c)(1). The Court may set aside the jury verdict and enter an acquittal. *Id.* at 29(c)(2). Courts review a motion for judgment of acquittal applying the same test as a challenge to the sufficiency of the evidence. *United States v. Ladum*, 141 F.3d 1328, 1337 (9th Cir. 1998). In considering whether there is sufficient evidence to deny a motion for judgment of acquittal, courts "review the evidence presented in the light most favorable to the government to determine whether any rational

1  trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

2  *Id.*

3  **B.   New Trial**

4  With respect to a motion for new trial, "the court may vacate any judgment and grant

5  a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court has

6  greater discretion to grant a new trial than to grant a judgment of acquittal. *United States v.*

7  *Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000). Thus, in considering a motion for new trial,

8  "[t]he court is not obliged to view the evidence in the light most favorable to the verdict, and

9  it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *Id.*

10  More specifically, "[i]f the court concludes that, despite the abstract sufficiency of the

11  evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the

12  verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict,

13  grant a new trial, and submit the issue for determination by another jury." *Id.* (internal

14  quotations omitted). However, the authority to grant a new trial should be used "only in

15  exceptional cases." *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984).

16  **III.   Kerr's Motion for Judgment of Acquittal and New Trial**

17  Kerr claims that the Government "failed to meet its burden as to willfulness on each

18  of the substantive counts." (Doc. 302 at 3). Kerr moves for judgment of acquittal or new trial

19  because: 1) Rusch's testimony should be excluded when determining the sufficiency of the

20  evidence; 2) Kerr was acquitted of conspiracy, and the overt acts of the substantive offenses

21  were required elements of the conspiracy count; 3) the Government failed to prove Kerr had

22  a legal duty to report income from the foreign corporations; and 4) the Government

23  committed prosecutorial misconduct by using the term "fraudulent" in closing arguments.

24  Furthermore, Kerr lists eight additional grounds for acquittal or for a new trial without

25  providing any factual support or legal authority for his arguments, including: 1) the

26  admission of Government exhibits on redirect violates Kerr's Sixth Amendment right to

27

28

1   confrontation;[2] 2) the indictment erroneously indicated Kerr's Failure to File FBAR forms

2   under Schedule B, Section II, Line 7a; 3) the Court failed to provide Kerr's proposed "theory

3   of the case" jury instruction; 4) the Government misstated in closing arguments that Kerr

4   owed taxes; 5) the Government committed prosecutorial misconduct by accusing defense

5   counsel of tampering with the impeachment tape of Rusch; 6) the Court improperly denied

6   Kerr's request that the Court order the Government to provide Special Agent Giovannelli's

7   Report; 7) the Court failed to provide jury instructions about expenses rightfully deductible

8   from income; and 8) the Court erroneously allowed the Government to use the definitions

9   in the FBAR form in the jury instructions.

10          **A.      Rusch's Testimony**

11          Kerr argues that Rusch's testimony should be excluded in determining the sufficiency

12   of the evidence on the substantive counts because it is inadmissible under the crime-fraud

13   exception to attorney-client privilege and under the co-conspirator exception to hearsay.

14                  **1.      Attorney-Client Privilege**

15          Kerr claims that the Court admitted Rusch's testimony under the crime-fraud

16   exception to attorney-client privilege. (Doc. 302 at 4). Because Defendants were acquitted

17   of Count 1, Conspiracy to Defraud the United States, Kerr argues that the crime-fraud

18   exception does not apply; therefore, Rusch's testimony violates attorney-client privilege and

19   should be excluded when determining the sufficiency of the evidence on the substantive

20   counts. (*Id.*) However, in its July 17, 2012 Order, the Court held that Defendants waived

21   attorney-client privilege by claiming that their failure to file FBARs and their filing false tax

22   returns was based on the advice of counsel. (Doc. 96 at 5). Furthermore, the Court denied

23   Kerr's Motion to Preclude Admission of Items Protected by Attorney-Client Privilege (Doc.

24   118), and noted that "the Court found that . . . implicit waiver had occurred for any

25   information relating to Kerr filing FBARs, and filing tax returns for tax years 2007 and

26

27          [2] This argument is addressed below in Quiel's Motion for a Judgment of Acquittal or
     for a New Trial, which Kerr joined in. (Doc. 314 at 15). Therefore, the Court's analysis of
28   the issue applies equally to Kerr.

1   2008." (Doc. 145 at 8 n.1). Therefore, the Court did not permit Rusch's testimony under the

2   crime-fraud exception.[3]

3       Kerr argues that the advice of counsel defense may waive the privilege "as to

4   documents presented early on[,]" but does not waive the privilege regarding Rusch's

5   testimony because the advice of counsel defense did not require Rusch to testify. (Doc. 302

6   at 4 n.2). Kerr does not cite any legal authority in support of this argument. (*Id.*) The

7   Government was entitled to the specified privileged information because Kerr implicitly

8   waived attorney-client privilege. (Doc. 96). Kerr offers no cases suggesting that Kerr may

9   waive privilege as to the communications, but preserve privilege regarding Rusch's

10  testimony about the same information. Furthermore, Kerr never objected to the testimony at

11  trial.[4] Kerr also claims that he was "considering using [advice] of counsel as a possible

12  defense," but instead "put on no defense." (Doc. 314 at 4). This claim is inaccurate because

13  Kerr presented this defense in both opening and closing arguments and requested and

14  received a jury instruction encapsulating that defense. (*See e.g.* Doc. 325 at 124) ("Now this

15  is their lawyer. This is a tax expert. They believe him. They rely upon this advice."); (Doc.

16  338 at 79) ("a very, very important jury instruction in the case . . . that's basically the

17  instruction regarding the reliance on counsel"); (Doc. 287 at 35) (jury instruction for advice

18  of counsel defense). Accordingly, the Court can find no error in the admission of Rusch's

19  testimony, and such testimony will not be excluded when determining the sufficiency of the

20  evidence under Rule 29(c)(2) or Rule 33(a).

21          **2.      Co-Conspirator Exception to Hearsay**

22      Kerr argues that Rusch's testimony should not be admitted under the co-conspirator

23  exception to hearsay (Fed. R. Evid. 801(d)(2)(E)). (Doc. 302 at 8-10). However, Kerr fails

24  _____

25  [3] Kerr fails to point to any part of the Record where the Court admitted Rusch's

26  testimony pursuant to the crime-fraud exception.

27  [4] Quiel objected at trial that Rusch was testifying in violation of attorney-client
    privilege; however, the Court overruled the objection based on its previous rulings. (Doc. 331

28  at 36).

to cite to any part of the Record where such admission of evidence occurred. Kerr's failure to indicate where in the Record error occurred prevents the Court from making any meaningful analysis of this issue. In his Reply, Kerr asserts that "the majority of statements" allegedly admitted under the co-conspirator exception were "Rusch's [with regard to his] understanding of the Defendants [sic] knowledge as to the legality of their actions[;]" however, he does not cite any specific statements. (Doc. 314 at 6).

Without any specific statements that were allegedly admitted pursuant to the exception, the Court is skeptical of Kerr's arguments for the following reasons. First, Rusch's knowledge is not hearsay. Second, the Court can envision circumstances in which the testimony would be admissible. For example, if Rusch testified to statements made by Kerr, the testimony is admissible under Fed. R. Evid. 801(d)(2), an opposing party's statement. Furthermore, if the statements were not asserted for the truth of the matter, but to establish the effect on the listener or basis in fact for the Rusch's subsequent actions, then the statements would be allowed based on Fed. R. Evid. 801(c). *See United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991) (holding that out-of-court statements introduced to show the effect on the listener are not hearsay); *United States v. Walling*, 486 F.2d 229, 234 (9th Cir. 1973) (holding that statement was not hearsay because it was offered to demonstrate the "circumstances which served as a foundation for [witness's] own observations and actions"). Because Kerr does not cite to the record indicating where the Court admitted the testimony under Rule 801(d)(2)(E), and does not cite to the specific statements in Rusch's testimony that he allegedly objected to at trial (Doc. 314 at 7), the Court will not exclude Rusch's testimony in determining the sufficiency of the evidence under Rule 29(c)(2) or Rule 33(a).

## B.    Willful Intent

Kerr argues that the "overt acts of the substantive offenses were required elements of the conspiracy count." (Doc. 314 at 10). Kerr claims that the Government failed to prove "any other knowledge or intent of illegality except for that required to prove the conspiracy–that the Defendants did this to defraud the IRS." (*Id.* at 11). Because the jury acquitted Kerr of conspiracy, he alleges that the elements of the substantive counts cannot

be proven; therefore, the government "failed to prove the required illegal intent." (*Id.* at 10).

"[I]t is well-established that 'inconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support a guilty verdict.'" *United States v. Suarez*, 682 F.3d 1214, 1218 (9th Cir. 2012) (internal citations omitted). In this case, the jury was instructed that they must find Kerr acted "willfully" to be guilty of the substantive counts. (Doc. 287 at 25, 28). The jury could have acquitted Kerr of conspiracy for reasons unrelated to Kerr's intent. For example, the jury could have determined that the Government did not prove there was an agreement between the co-conspirators. The jury was properly instructed about Kerr's intent for the substantive counts; thus, by finding Kerr guilty, the jury found that Kerr acted willfully. Therefore, the Court denies Kerr's motion for judgment of acquittal or a new trial under this theory.

### C.    Legal Duty to Report Income

Kerr claims that the Government failed to prove a legal duty to report income and foreign accounts; therefore, the Government did not prove willfulness. (Doc. 314 at 11).  To prove willfulness, the Government must show the "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). In *Cheek*, the United States Supreme Court held:

> Carrying this burden requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax law. This is so because one cannot be aware that the law imposes a duty upon him and yet be ignorant of it, misunderstand the law, or believe that the duty does not exist.

*Id.*

Kerr argues that the Government did not meet their burden because there was "no expert testimony or evidence" that proved the income was reportable on Kerr's personal tax return. (Doc. 302 at 16). Kerr does not cite to any legal authority requiring expert testimony to prove a legal duty to report. Furthermore, the Government presented evidence at trial from which the jury could conclude that Defendants had a legal duty to report income and foreign accounts.

In addition, during the settling conference for jury instructions, Defendants objected that the FBAR instruction "presuppose[s] that the defendants did have a legal obligation to file an FBAR." (Doc. 337 at 15). The Government responded that the instructions require that the jury first determine that Defendants had an obligation to file the FBAR based on the evidence, and the Court agreed and overruled Kerr's objection. (*Id.* at 18). Viewing the evidence in the light most favorable to the Government, the Government met its burden in proving that Kerr had a legal duty to report income and foreign accounts, and knew of the duty. Therefore, a jury could have found that Kerr acted willfully beyond reasonable doubt. Furthermore, the evidence does not preponderate heavily against the verdict and there was no miscarriage of justice. Accordingly, the Court denies Kerr's motion for judgment of acquittal or a new trial under this theory.

### D.   Prosecutorial Misconduct

Kerr asserts that the Government committed prosecutorial misconduct by continually referring to stock transactions as "fraudulent." (Doc. 302 at 25). The Court ordered the Government not to describe the securities transactions in terms of "SEC violations" or "violations of security laws." (Doc. 337 at 19). The Court permitted the Government to describe particular conduct as "fraudulent" under Fed. R. Evid. 404(b)(2) because "that conduct helps establish a motive on [Defendants'] part to violate the tax laws." (*Id.* at 22-23). The Government complied with the Court's ruling; therefore, there was no prosecutorial misconduct. Accordingly, the Court denies Kerr's motion for judgment of acquittal or a new trial under this theory.

### E.   Erroneous Indictment

Kerr argues that the Indictment erroneously indicated that Kerr failed to file FBAR forms under Schedule B, Section II, instead of Schedule B, Section III. (Doc. 302 at 29). The Court overruled Kerr's objection to correcting this typographical error during the jury instructions conference. (Doc. 337 at 15). Kerr has not presented any argument that would cause the Court to reconsider its prior decision. Thus, the Court denies Kerr's motion for judgment of acquittal or a new trial under this theory.

### F.        Instructions on Defendant's Theory of the Case

Kerr argues that the Court failed to provide a jury instruction on Kerr's theory of the case. (Doc. 302 at 29). Kerr raised this issue during the jury instructions conference, and the Court rejected it. (Doc. 337 at 18-19). The jury was properly instructed on Kerr's theory of the case regarding "advice of counsel" and "good faith misunderstanding of the law." (Doc. 287 at 33-35). Accordingly, the Court denies Kerr's motion for judgment of acquittal or a new trial under this theory.

### G.        Misstated Evidence in Closing Argument

Kerr claims that the Government misstated evidence that Kerr owed taxes during the closing argument. (Doc. 302 at 29). Kerr did not object at trial, so the Court will review for plain error. *See United States v. Cabrera,* 201 F.3d 1243, 1246 (9th Cir. 2000). In Response to Kerr's argument, the Government argues that no evidence was misstated because the Government presented evidence that Kerr "failed to report significant income" in 2007 and 2008, that Kerr had a "tax liability even though [he] failed to report this income," that the Government stated in closing arguments that the jury did not need to find a tax liability in order to convict Kerr on the false returns, and that a jury instruction was given in relation to this matter. (Doc. 311 at 23); (Doc. 303 at 47); (Doc. 287 at 27). Because Kerr presents no legal support for his arguments, Kerr's motion for judgment of acquittal or a new trial under this theory is denied.

### H.        Accusation of Evidence Tampering

Kerr asserts that the Government committed prosecutorial misconduct by accusing defense counsel of engaging in evidence tampering. Kerr argues that the Government prejudiced the jury by accusing counsel of doctoring the impeachment tape of Rusch, and suborning perjury by Rusch. (Doc. 302 at 29). However, Kerr does not provide any factual support or legal authority to support this argument. Furthermore, Kerr did not object at trial; therefore, the claim is subject to plain error review. *United States v. Cabrera,* 201 F.3d at 1246. A claim for prosecutorial misconduct is viewed in context of the entire trial. *Id.* "Reversal on this basis is justified only if it appears more probable than not that prosecutorial

1   misconduct materially affected the fairness of the trial." *United States v. Sayakhom,* 186 F.3d
2   928, 943 (9th Cir. 1999).

3        The Government responds that it did not claim that Defendants tampered with or
4   doctored the tape. (Doc. 311 at 24). The Government merely stated that the tape was edited
5   and did not capture the entire meeting. (*Id.*) During cross-examination by Quiel's counsel,
6   Rusch stated that Quiel "played a clearly and obviously edited tape, which I also believe to
7   be completely misleading." (Doc. 334 at 208). He continued on by saying, "I know for a fact
8   that you edited the beginning of the tape." (*Id.* at 209). In closing arguments, the Government
9   referred to the tape as being "blatantly edited" because it does not "include anything from
10  the very beginning of this meeting." (Doc. 303 at 61). This statement does not rise to the
11  level of prosecutorial misconduct. Accordingly, the Court denies Kerr's motion for judgment
12  of acquittal or a new trial under this theory.

13        **I.      IRS Special Agent's Report**

14        Kerr claims that his right to a fair trial was violated because the Court did not order
15  the Government to provide the Special Agent's Report ("SAR"), which he alleges may
16  contain *Brady* material. (Doc. 302 at 29). In its October 2, 2012 Order, the Court held that
17  Kerr failed to show that the Government is withholding *Brady* material; therefore, in
18  accordance with the Federal Rules of Criminal Procedure, the SAR only had to be disclosed
19  if the Special Agent testified. (Doc. 107 at 4). Kerr has not presented any argument that
20  would cause the Court to reconsider its prior decision. The Special Agent did not testify at
21  trial, and thus the Government was not required to disclose the SAR. Accordingly, the Court
22  denies Kerr's motion for judgment of acquittal or a new trial under this theory.

23

24        **J.      Instruction on Deductible Expenses**

25        Kerr claims that the Court failed to include the required jury instruction on deductible
26  expenses. (Doc. 302 at 29). When reviewing a claim of error relating to jury instructions, the
27  instructions must be viewed as a whole. *United States v. Abushi*, 62 F.2d 1289, 1299 (9th Cir.
28  1982). A trial judge is given substantial latitude in tailoring jury instructions so long as they

1    fairly and adequately address the issues presented. *United States v. James*, 576 F.2d 223, 226

2    (9th Cir. 1978). In *United States v. Marabelles*, the Court addressed the issue of whether the

3    defendant was entitled to an instruction regarding deductible expenses in a tax evasion and

4    false return case. 724 F.3d 1374, 1382 (9th Cir. 1984). The defendant in that case requested

5    an instruction related to unsubstantiated expenses that he claimed reduced his tax liability.

6    *Id.* The Ninth Circuit Court of Appeals held that the district court's refusal to provide the

7    defendant's instruction was not error because it would not have "materially affected the

8    §7206(1) conviction since a tax deficiency is not an element of that crime." *Id.*

9           In the present case, Kerr does not cite to a specific instruction requested, or provide

10   any factual or legal support for his argument. Looking at the instructions as a whole, the jury

11   was instructed that they could consider a lack of tax due when determining willfulness. (Doc.

12   287 at 27). Furthermore, the gross income instruction defines gross income as "all income

13   received before making any deductions allowed by law," which indicates that Defendants

14   may be entitled to deduct expenses. (*Id.* at 38). These instructions fairly and adequately

15   address the issue presented. Accordingly, the Court denies Kerr's motion for judgment of

16   acquittal or a new trial under this theory.

17          **K.    FBAR Definitions**

18          Kerr argues that the Court erred in giving the Government's proposed jury

19   instructions, which included definitions from the FBAR instructions because no regulation

20   addressed these definitions. (Doc. 302 at 30). The FBAR filing requirements in effect during

21   2007 and 2008 are outlined in 31 C.F.R. § 103.24. The regulation incorporates the definitions

22   set forth in the general instructions prescribed by the Secretary of the Treasury and included

23   with the FBAR form. *See* 31 C.F.R. § 103.24 ("each person . . . shall provide such

24   information as shall be specified in a reporting form prescribed by the Secretary to be filed

25   by such persons"). In addition, 31 C.F.R. § 103.27(c)-(d) provides further details for reports

26   filed pursuant to section 103.24, including the filing deadline date, the minimum account

27   balance, and the specific reports required. The FBAR form and the instructions were

28   modified in 2008, and the jury was properly instructed about the modified definitions for the

2008 count. Accordingly, Kerr's claim that there is no regulation addressing the FBAR definitions is incorrect. Therefore, the Court denies Kerr's motion for judgment of acquittal or a new trial under this theory.

Based on the foregoing, Kerr's Renewed Motion for Rule 29 Judgment of Acquittal or, in the alternative, a New Trial is denied.

## III.   Quiel's Motion for Judgment of Acquittal and New Trial

Quiel moves for judgment of acquittal based on four claims: 1) the admission of new exhibits on redirect without the opportunity to cross-examine violated the Confrontation Clause of the Sixth Amendment; 2) the conviction was based on an erroneous indictment;[5] 3) Rusch's testimony should have been stricken because Rusch committed perjury and the Government never linked his testimony to the alleged conspiracy; and 4) the Court erred in admitting redacted documents. (Doc. 301).

### A.   Confrontation Clause

Quiel asserts that the Court erred in issuing a "complete ban on recross-examination" in violation of the Confrontation Clause of the Sixth Amendment. (Doc. 301 at 4). On day 3 of the trial, Quiel's counsel attempted to recross-examine a witness, Cheryl Bradley. (Doc. 326 at 264). At that time, Quiel's counsel stated "I . . . do have three follow-up, please Your Honor." (*Id.*). The Court responded, "Well, that's called recross, which we don't permit. You had three follow-up." (*Id.*). Quiel's counsel, responded "Yes, Your Honor, in relationship to her questions." (*Id.*). In reply, the Court stated, "There's no such thing as recross examination. That will be denied." (*Id.*)

Quiel now argues that, later in the trial, during the testimony of Chris Rusch, he was chilled from recross-examination based on the Court's earlier admonition. (Doc. 312 at 6). Quiel specifically argues that limiting recross-examination regarding Exhibits 44, 51, and 52, which were admitted during the Government's redirect examination of Mr. Rusch,

---

[5] The issue regarding the erroneous indictment has already been addressed above; accordingly, that analysis applies equally to Quiel.

violated the Confrontation Clause. (*Id.* at 3). Quiel did not attempt to recross-examine Rusch at the time of the testimony and did not make any reference to the Court's earlier admonition regarding re-cross examination at the time of Rusch's testimony. Defense counsel did object that the admission of Exhibits 44, 51, and 52 was outside the scope of cross-examination, but the Court was unpersuaded that those Exhibits were new matter and, thus, overruled those objections.  Quiel now appears to argue that, pursuant to the Ninth Circuit Court of Appeals decision in *United States v. Jones*, 982 F.2d 380, 383-84 (9th Cir. 1992), recross-examination must be permitted.

 Recross-examination is not guaranteed under the Confrontation Clause. *See United States v. Baker*, 10 F.3d 1374, 1404 (9th Cir. 1993), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000) ("Allowing recross is within the sound discretion of the trial court"); *United States v. Riggi*, 951 F.2d 1368, 1374 (3rd Cir. 1991) ("As a general rule, a trial court has wide discretion to restrict recross-examination"). However, "[w]hen material new matters are brought out on redirect examination, the Confrontation Clause of the Sixth Amendment mandates that the opposing party be given the right of recross-examination on those new matters." *United States v. Jones*, 982 F.2d 380, 384 (9th Cir. 1992) (quoting *United States v. Riggi*, 951 F.2d 1368, 1375 (3rd Cir. 1991)).

 " If 'new matter' is defined broadly, then any question asked on redirect that had not already been asked and answered would conceivably introduce 'new matter' requiring the opportunity for recross insofar as it expanded or elaborated on the witness' previous testimony. Such an approach would conflict with the trial court's discretion to impose reasonable limits on cross-examination" *Baker*, 10 F.3d at 1405. However, a "new matter" is not limited to a "new subject," but also applies to newly elicited material testimony within a particular subject area. *Id.* Accordingly, recross-examination is only necessary when "new matter" is elicited on re-direct.

 Defendants did not argue during trial that they should be entitled to recross-examination because a new matter was being elicited during redirect.  Although, during the testimony of Ms. Bradley, defense counsel requested re-cross, defense counsel gave no

reason as to why he was entitled to recross-examination of that witness or any other witness. Further, it is of concern to the Court that, after receiving an unfavorable jury verdict, Defendants now seek reconsideration of the "alleged" "blanket ban" on recross-examination, such "ban" having occurred on day 3 of a 19-day trial, based on Defendants' argument that they were "chilled" from previously seeking such reconsideration from the Court.  The Court does not see how the Defendants were chilled from seeking reconsideration during trial, but now feel completely free to seek such reconsideration.  The Court's concerns about the timing of Defendants' claimed "chilling effect" is highlight by the fact that, although Defendants argue that there is a binding Ninth Circuit Court of Appeals case on point, which allows for recross-examination under certain circumstances, and Defendants believe that they are within those circumstances where recross-examination is appropriate, Defendants waited to bring that binding case to the Court's attention until after receiving an unfavorable jury verdict.

Despite these substantial concerns, the Court will assume, for the purposes of this Order, that Defendants were chilled from seeking recross-examination for witnesses that followed Ms. Bradley.  Accordingly, the Court must determine whether new matter was elicited on redirect examination in violation of Defendants' Sixth Amendment right to confrontation.

In his argument, Quiel relies heavily on *United States v. Jones*, in which the defendant was convicted of drug violations. 982 F.2d at 382. In *Jones*, the defendant believed the district court imposed a blanket prohibition on recross-examination. *Id.* at 384. On redirect, the Government's witness, Alex Vasilieff, identified the defendant for the first time and placed him at the scene of the crime, corroborating the damaging testimony made by other witnesses. *Id.* The Ninth Circuit Court of Appeals held that "the district court's ban on recross examination prevented Jones from probing Vasilief's [sic] incriminating testimony." *Id.* In *Jones*, the ban on recross-examination violated the defendant's Confrontation Clause rights because he was "unable to subject the prosecution's case to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Id.* at 384-85 (internal

1  quotations omitted).

2       In the present case, Quiel asserts that the Government's Exhibits 44, 51, and 52 were

3  new matters presented on redirect. (Doc. 301 at 3). Exhibit 44 is a fax from Rusch to Pierre

4  Gabris, a private banker who opened foreign bank accounts (Doc. 331 at 32) containing

5  written instructions regarding stock transactions. (Doc. 335 at 91-92). Exhibits 51 and 52 are

6  emails that Rusch received from Gabris that provide accounting statements for the foreign

7  accounts. (*Id.* at 101). On direct examination, the Government asked Rusch how stock

8  transactions occurred. (Doc. 331 at 145). Rusch responded, "The vast majority of the time

9  Mr. Quiel would phone me and give me an instruction to sell or buy or make a transfer. I

10 would write that down. I would type it up into a fax and fax it over to Mr. Gabris." (*Id.*)

11 When the Government questioned Rusch about the activity in the foreign accounts, Rusch

12 stated that he received "[a]n accounting typed up in Excel and sent to [him] by e-mail from

13 Pierre Gabris," which Rusch would then fax to Mr. Quiel. (*Id.* at 152). Rusch further

14 elaborated that he never emailed Kerr or Quiel regarding their foreign accounts because he

15 was "given instruction not to have any e-mail trail for these accounts, and to send everything

16 by fax." (*Id.* at 153).

17      On cross-examination, both Defendants questioned Rusch's credibility regarding his

18 testimony on the instructions for stock transactions and the accountings he forwarded to

19 Defendants. During cross-examination, Kerr addressed the lack of written records for stock

20 transactions:

21          Q: When those stocks are eventually sold, the whole activity of
            selling those stocks, getting those stocks into management
22          companies, the mechanical process of doing that was done ply
            [sic] by Mr. Gabris or by you. You're the only ones that could
23          control these. Right?
            A: Well, the mechanical process was Mr. Quiel would give me
24          instructions, I would write them down, I would type up a fax, I
            would send that fax to Mr. Gabris and he would act upon it.
25          Q: You say those were instructions Mr. Quiel would give you
            but I don't see any record of that in anything in writing. There's
26          nothing in writing where he gave you instructions, is there?
            A: No. He was very specific not to keep any written–
27          Q: There are no instructions, are there, that he put in writing to
            tell you to sell any stock or anything?
28          A: No, there's not.

1    (Doc. 334 at 71-72). Kerr also discussed the accountings with Rusch:

2           Q: Well, Mr. Kerr wasn't getting any bank records. Who was
            getting them?
3           A: Mr. Gabris.
            Q: So Mr. Gabris got all these records. Did he send copies to
4           you?
            A: Not of the bank statements.
5           Q: So the knowledge of the money and what was going in the
            account was Mr. Gabris and you didn't have any knowledge
6           about it?
            A: Well, no, that's not what I said. You asked me if the bank
7           statements were sent to me. They were not. Mr. Gabris would
            send accountings of transactions, investments, positions in Excel
8           format, send them to me by email and I would forward them on
            to Mr. Kerr and Mr. Quiel by fax.
9
    (Doc. 334 at 58-59). Furthermore, Kerr questioned Rusch about whether there are records
10
    to show that Defendants knew what Rusch was doing:
11
            Q: I'm asking you at this point in time, did you have documents
12          in the file that are copies of the documents that you sent to Mr.
            Kerr or Mr. Quiel, which would show how you were basically
13          handling all this money and transferring it from account to
            account?
14          A: I had them on computer file, yes. I did not have them in
            printed files, no.
15          Q: Okay. And where is that computer file?
            A: I haven't had it for a number of years. Before this–before this
16          occurred I'd lost the computer.
            Q: You lost the computer before this occurred?
17          A: Yes. The hard drive was damaged.
            Q: So you don't really have any records that would show that
18          you had been giving them reports about how all of this money
            was getting spent, correct?
19          A: If I recall the discovery, I think there was some accounting
            in there. I mean, we're talking 20,000 pages. I don't recall it all,
20          but–
            Q: You're talking about bank records. I'm talking about a report
21          where you said you apprised them of what you were doing.
            A: I believe there is an Excel file in the documents, yes.
22          Q: There's an actual file that you have broken down that shows
            how you're spending money all during this period of time from
23          2006 clear up to 2008?
            A: No. I'm saying there's an accounting from Mr. Gabris related
24          to their transactions.
            Q: But you said you did have something that was on your
25          computer, now it's lost?
            A: No. I'm saying there's an accounting from Mr. Gabris related
26          to their transactions.
            Q: But you said you did have something that was on your
27          computer, now it's lost?
            A: I had a number of files, and I believe I only had one or two
28          at the time of this case coming about.

                                        - 16 -

> Q: So in effect we just don't have any records from your computer.
> A: Other than what I have already produced, correct.

(Doc. 334 at 135-36). During cross-examination by Quiel, Rusch also discussed the lack of records and missing computer:

> Q: And you weren't able to–as you've been cooperating and working and helping with the Government, you weren't able to give them all of your own records because many of them were destroyed when your computer disappeared.
> A: I gave them all of the records that I had of myself and Mr. Kerr and Mr. Quiel.
> Q: When did your computer disappear?
> A: My computer didn't disappear. I had a–lost a hard drive, which means it had become damaged, I'm thinking 2009 maybe when I moved to Switzerland.
> Q: Where is the hard drive now?
> A: I haven't had it for years.
> Q: What did you do with it?
> A: I just replaced the computer.
> Q: Did you throw the hard drive away?
> A: Yes, I got rid of the entire computer.
> Q: So it's gone. If anybody wanted to check it out or try to reconstruct it or fix it, it's gone.
> A: Yes.
> Q: You never gave your clients an opportunity to try to have someone check out that hard drive to see if it could be salvaged, correct?
> A: That's correct.
> Q: You never gave the Government an opportunity to check the hard drive to see if any of it could be salvaged, correct?
> A: Correct.

(Doc. 335 at 42-43). Throughout cross-examination, Defendants raised questions about whether the documents Rusch described exist or if Rusch and Gabris were acting without Defendants' knowledge.

The Government argues that the exhibits were "introduced on redirect for the limited purpose of rehabilitating Rusch's testimony and establishing that the documents indeed existed." (Doc. 310 at 7). On redirect, Rusch testified that "on each and every transaction Mr. Quiel would give me very specific instructions." (Doc. 335 at 89). In describing Exhibit 44, Rusch reiterated that Quiel provided information on the desired stock transaction, and then Rusch "wrote up the document" and "faxed it to Mr. Gabris." (*Id.* at 92, 95). When discussing Exhibits 51 and 52, Rusch described them as "e-mails that [he] received from Mr.

Gabris that are accounting statements that [he] forwarded on to Messrs. Kerr and Mr. Quiel." (*Id.* at 101). The Government further questioned him:

> Q: And why did [Gabris] provide [Exhibit 51] to you?
> A: Mr. Quiel phoned me and asked me to get an accounting. I telephoned Mr. Gabris, obtained that accounting.
> Q: And what did you do once you received this e-mail?
> A: I printed it out and faxed it to Mr. Quiel and to Mr. Kerr, and then placed it in my file.

(Doc. 335 at 102).

Rusch's testimony on redirect examination was consistent with his testimony on direct and cross-examination. *See United States v. Croft*, 124 F.3d 1109, 1121 (9th Cir. 1997) (holding that no recross is required when defendant sought to use sworn affidavits to establish "inconsistencies that could have been and were covered on cross-examination"). Unlike in *Jones*, where the witness identified the defendant and placed him at the scene of the crime for the first time on redirect, here Rusch repeated testimony that had already been covered. On cross-examination, Defendants had the opportunity to impeach Rusch regarding the stock transactions and accountings. That was not the case in *Jones*, where the Court found that the witness's testimony was not subject to the "rigorous adversarial testing" in the criminal proceedings. 982 F.2d at 384. Therefore, the present case is distinguishable from *Jones*.

In addition, the Court did not release Rusch from the subpoena; thus, he remained "subject to recall." (Doc. 335 at 159). Defendants could have recalled Rusch in their case-in-chief to further question him on direct examination.[6] *See United States v. Ross*, 33 F.3d 1507, 1518 (11th Cir. 1994) ("prevention of recross-examination 'would not have prevented appellant from confronting his accusers; it would only have affected the order of confrontation. All the witnesses were equally available to the appellant and could have been called to the witness stand by him and questioned on direct examination as to any point he

---

[6] Furthermore, Rusch could be classified as a hostile witness or a witness identified as an adverse party under Federal Rule of Evidence 611(c)(2), allowing Defendants to use leading questions on direct examination.

desired.'") (quoting *Hale v. United States*, 435 F.2d 737, 752 n.22 (5th Cir. 1970)). Therefore, the Government did not raise new matters on redirect examination in violation of the Confrontation Clause. Accordingly, the Court denies Quiel's motion for judgment of acquittal or a new trial under this theory.

### B.    Rusch's Testimony

Quiel claims that the Court should have stricken Rusch's testimony because he "is a known perjurer," and the Government never established that the crime-fraud exception to attorney-client privilege applied.[7] (Doc. 301 at 5). The Supreme Court has held that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). A new trial is required if the false evidence is material, and its inclusion undermines the confidence in the judgment of the jury. *Maxwell v. Roe*, 628 F.3d 486, 499 (9th Cir. 2010). Quiel alleges that Rusch committed perjury by: 1) denying on cross-examination that he told Defendants and their defense counsel in a January 2011 meeting that he had followed the law, but after hearing a secret tape recording of the meeting, admitted making the statements and claimed that it was "spin;" and 2) testifying that the "bathroom scene" on the secret tape recording was inserted into the tape to cover up something. (Doc. 301 at 5 n.1).

First, Rusch did deny on cross-examination that he told Defendants and their counsel that everything was legal. (Doc. 332 at 50). However, he stated that, during the meeting, he was talking about possible lines of defense. (*Id.* at 51). On the audio recording, Rusch described proposed lines of defense as his "spin" on the matter. (Doc. 310 at 12). This statement was confirmed on redirect. (Doc. 335 at 141-42). Second, Rusch testified that he believed that other statements he made in the meeting were omitted from the tape during the "bathroom scene." (Doc. 334 at 210). Rusch testified that he knew the beginning of the

---

[7] The Court addressed the crime-fraud exception issue in Kerr's Motion above. Accordingly, the Court will not readdress that issue here.

1   meeting was taken out of the tape, and that he was just speculating on why his other

2   comments regarding viable defenses are not on the tape. (*Id.* at 211). It is the jury's province

3   to determine the credibility of witnesses. *United States v. Sanchez-Lima,* 161 F.3d 545, 548

4   (9th Cir. 1998). The tape and Rusch's statements were presented to the jury, who found

5   Defendants guilty. Quiel has presented no evidence that proves Rusch committed perjury.

6   Therefore, the Court denies Quiel's motion for judgment of acquittal or a new trial under this

7   theory.

8   **C.      Redacted Documents**

9        Quiel claims that the Court should have refused to admit redacted documents that the

10   defense was unable to review. (Doc. 301 at 8). Quiel does not specify which exhibits he is

11   referring to. Quiel does specifically object, however, to the Government's use of portions of

12   the Individual Master File (IMF) without providing defense counsel the complete record.

13   (*Id.*) Providing the relevant parts of the IMF to the defendant may be sufficient. *United States*

14   *v. Fusero*, 106 F.Supp.2d 921, 925 (E.D. Mich. 2000). The Government avows that it turned

15   over all relevant portions of the IMF record. (Doc. 310 at 17). Quiel claims that there may

16   be exculpatory evidence in the IMF, but he does not point to any specific evidence that may

17   be in the file. (Doc. 301 at 9).  Although not mentioned in Quiel's Motion, the Court notes

18   that Quiel objected to the admission of IRS Form 4340 (Exhibit 263) and sought that the

19   entire IMF file be disclosed at trial. (Doc. 258 at 102). This objection was overruled, and

20   Quiel fails to establish evidence that would cause the Court to reconsider its prior decision.

21   (*Id.* at 113). Accordingly, the Court denies Quiel's motion for judgment of acquittal or a new

22   trial under this theory.

23        Based on the foregoing, Quiel's Motion for a Judgment of Acquittal or for a New

24   Trial is denied.

25   **IV.   Conclusion**

26        Accordingly,

27        **IT IS ORDERED** that Kerr's Renewed Motion for Rule 29 Judgment of Acquittal

28   or, in the alternative, a New Trial (Doc. 302) is denied.

1        **IT IS FURTHER ORDERED** that Quiel's Motion for a Judgment of Acquittal or

2   for a New Trial (Doc. 301) is denied.

3        DATED this 16th day of August, 2013.

4

5

6   _____

7                James A. Teilborg
                 Senior United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28